IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MANITH VILAYHONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:19-CV-00748-MAB |
| | ) | |
| VENERIO SANTOS, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on the motions, and supporting memoranda, for summary judgment filed by Defendants Venerio Santos and Wexford Health Sources, Inc. (Docs. 141, 142) and Defendants Steve Meeks and Lana Nalewajka (Docs. 160, 161). Defendants Wexford and Santos also filed a motion to seal documents that accompany their briefing (Doc. 139) as well as a motion to strike related to their motion to seal (Doc. 155). For the reasons set forth below, the motion to seal is **DENIED**; the motion to strike is similarly **DENIED**; and the motion for summary judgment filed by Santos and Wexford is **DENIED IN PART and GRANTED IN PART**. The motion for summary judgment filed by Meeks and Nalewajka is **GRANTED**.

## BACKGROUND

Plaintiff filed his *pro* se complaint on July 11, 2019, pursuant to 42 U.S.C. § 1983, alleging that certain prison employees acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment while incarcerated at Centralia

Correctional Center ("Centralia") (Docs. 1, 15).

Plaintiff was appointed counsel on January 17, 2020 (Docs. 88, 89). Plaintiff's appointed counsel filed the amended, governing complaint on June 3, 2020 (Doc. 99). Plaintiff asserts Eighth Amendment claims against Defendants Santos, Nalewajka, and Meeks for their deliberate indifference to his serious medical need, as Plaintiff claims they allowed him to unnecessarily suffer and experience prolonged pain and discomfort related to his ear pressure, distorted hearing, vertigo, tinnitus, and infection (Doc. 99, pp. 5-8). Plaintiff also advanced a claim against Wexford (the corporate entity), claiming Wexford's policies, practices, or procedures caused or contributed to his injuries and prolonged his pain (Doc. 99, pp. 7-8).

On October 12, 2021, Santos and Wexford filed a motion to seal exhibits accompanying their motion for summary judgment (Doc. 139). Santos and Wexford have also filed a motion to strike (Doc. 155), detailing that one of Plaintiff's exhibits attached to his response to the motion for summary judgment should be stricken as it should have been filed under seal. On January 18, 2022, Defendants Meeks and Nalewajka filed their motion, and supporting memorandum, for summary judgment (Docs. 160, 161).

### MOTION TO SEAL

"Secrecy in judicial proceedings is disfavored." *GEA Grp. AG v. Flex-N-Gate Corp.*, 740 F.3d 411, 419 (7th Cir. 2014). "Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010). *See also Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir.

2002) ("In civil litigation only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault), is entitled to be kept secret . . . ."). The Seventh Circuit has emphasized "that litigation be conducted in public to the maximum extent consistent with respecting trade secrets. . . and other facts that should be held in confidence." *Hicklin Eng'g, L.c. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006), *abrogated on other grounds by Americold Realty Trust v. Conagra Foods, Inc.*, 57 U.S. 378 (2016). Motions to seal parts of the record should be granted "only if there is good cause" for doing so. *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999)

Santos and Wexford seek to have seven exhibits sealed. Although Plaintiff never filed a response to the motion, Plaintiff voiced opposition to Defendants' request at a motion hearing. Even so, any request to seal must be scrutinized against the public's presumptive right of access to materials before the Court. *See Citizens*, 178 F.3d at 945 ("The judge is the primary representative of the public interest in the judicial process and is duty-bound therefore to review any request to seal the record (or part of it)."). The seven exhibits Defendants seek to file under seal are as follows:

1. Exhibit E—Screenshots of Wexford Health Sources, Inc.'s internal "WexCare" program showing the internal operations of Wexford Health Sources, Inc. utilization management;
2. Exhibit H—Wexford Health Sources Inc.'s internal Otolaryngology Guidelines;
3. Exhibit I—Wexford Health Sources, Inc.'s Internal Utilization Management Guidelines;
4. Exhibit J—Excerpts from FRCP 30(b)(6) witness Dr. Neil Fischer's deposition discussing Exhibits E, H, and I;

5. Exhibit K—Wexford Health Sources, Inc.'s internal ATP log for Plaintiff;
6. Exhibit L—Wexford Health Sources, Inc.'s September 2019 Monthly Outpatient Report Referral for ENT; and
7. Exhibit M—Excerpts from FRCP 30(b)(6) witness Mr. Nickloas Little's deposition discussing financial reporting and costs.

(Doc. 143, pp. 1-2).

Santos and Wexford did not initially make specific arguments for each of these exhibits as to why they should be filed under seal. Instead, they made blanket arguments that the instant request to seal was so analogous to another case within this district, that the Court should seal the seven exhibits at issue. However, in reviewing the motion to seal and the summary judgment briefing, the Court noticed that many of the documents Defendants sought to keep secret were openly discussed and analyzed in the unredacted summary judgment briefing (*See* Docs. 142, 144). Accordingly the Court ordered supplemental briefing on this subject. In the supplemental brief, Defendants argue the exhibits depict trade secrets, as defined under the Illinois Trade Secrets Act, 765 ILCS 1065/2(d) (the "Act"). The Act states that a trade secret is:

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, [or] technique…that is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

*Id.*

In analyzing whether an alleged trade secret meets these requirement, Illinois courts look to the following factors: "(1) the extent to which the information is known outside of the [movant's] business; (2) the extent to which the information is known by employees and others involved in the [movant's] business; (3) the extent of measures

taken by the [movant] to guard the secrecy of the information; (4) the value of the information to the [movant's] business and to its competitors; (5) the amount of time, effort and money expended by the [movant] in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003).

Here, Wexford describes Exhibits E, K, and L as technical or non-technical data of Wexford's programs and methods for delivering healthcare (*See* Doc. 103, p. 4). Exhibits H and I are internal guidelines and Exhibits J and M are deposition excerpts discussing the exhibits Wexford seeks to seal. But ultimately, Defendants briefing does not sufficiently address the many factors the Court must weigh to determine whether the exhibits at issue constitute trade secrets. For instance, Defendants argue that Wexford took reasonable steps to prevent disclosure of these exhibits by seeking a protective order in this case (Doc. 146, pp. 4-6). However, the protective order functions to maintain the secrecy of sensitive materials produced during *discovery* and is not indicative of whether materials filed with the Court can be shielded from public view (*See* Doc. 118). The Protective Order states that the Court will make "an individualized determination of whether any such protected document(s) or information can be filed under seal" (*Id.* at ¶ 12). *See also Baxter Intern., Inc.*, 297 F.3d at 545 ("Secrecy is fine at the discovery stage, before the material enters the judicial record."); *Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009) ("While the public has a presumptive right to access discovery materials that

are filed with the court…the same is not true of materials produced during discovery but not filed with the court.").

Nor have Defendants stated how, in practice, Wexford maintains the secrecy of its WexCare system and internal guidelines; the extent to which this type of information is known outside of Wexford's business or to others involved in its business; the amount of resources Wexford has expended to develop the system and its internal guidelines; or the ease or difficulty with which the information could be properly acquired or duplicated. In fact, the WexCare system, specifically, has been explained in at least one Seventh Circuit opinion. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 957 (7th Cir. 2019) ("If UM approved a patient for an offsite consultation at UIC, the UM department would enter the information into Wexford's computer program ('WexCare'), which triggered an electronic notice to the prison and UIC. Then, the staff at IDOC and UIC would coordinate to schedule the inmate's appointment."). And certainly this is not the first time an internal Wexford policy or procedure regarding treatment has made its way into a court record. *See e.g., Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 521 (7th Cir. 2019) ("Wexford's own Medical Policy and Procedures on the Repair of Abdominal Wall/Inguinal Hernias (introduced into evidence by Wilson)"). Moreover, the Wexford guidelines and policies they want to keep secret are openly discussed within Defendant's unsealed summary judgment briefing (*See e.g.*, Doc. 142, p. 20). Defendants advance arguments in support of summary judgment in reliance on these guidelines and the requirements contained within the guidelines (*See e.g.*, Doc. 142, p. 31).

Defendants argue that competitors could use the information depicted in the exhibits to elicit business away from Wexford by adapting and modifying its practices to attempt to create a "better" system (Doc. 146, pp. 5-6). However, Defendants do not explain with sufficient particularity what is depicted in the exhibits that subjects it to a potential harm. Instead, Defendants cite an Illinois circuit court case, which found that Wexford guidelines were exempt from disclosure because it was "clear" that Wexford had "gone to great time, and expense to develop their own specific protocols in how to treat most ailments that may arise in the inmate population" (Doc. 146-1).

This Court does not doubt that Wexford has expended significant resources in general in implementing its plan to provide inmate care within the IDOC; however it is not obvious how the specific exhibits amount to a trade secret. A party seeking to avoid disclosure must sufficiently explain how disclosure would cause harm and why the predicted harm warrants secrecy. *See Baxter*, 297 F.3d at 547 ("Beyond asserting that the document must be kept confidential because we say so…this contends only that disclosure 'could…harm Abbott's competitive positions.' How? Not explained. Why is this sort of harm (whatever it may be) a legal justification for secrecy in litigation? Not explained."). Defendants have not established that good cause exists to seal the exhibits, such that Wexford's privacy interests outweigh the interests of the public in full transparency of the judiciary. Accordingly, Defendants' Motion to File Summary Judgment Exhibits Under Seal (Doc. 139) is **DENIED**. The Clerk of Court will be **DIRECTED to UNSEAL** Doc. 143. In light of this decision, Defendants' motion to strike (Doc. 155) is **DENIED**.

## MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party always bears the initial responsibility of showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). The manner in which this showing can be made depends upon which party will bear the burden of proof on the challenged claim(s) at trial. *Celotex,* 477 U.S. at 331 (Brennan, J., dissenting). In cases such as this one, where the burden of proof at trial rests on the plaintiff, the defendant can make its initial showing on summary judgment in one of two ways. *Id.; see Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016); *Modrowski*, 712 F.3d at 1168. First, the defendant can show that there is an absence of evidence—meaning a complete failure of proof—supporting an essential element of the plaintiff's claim. *Celotex,* 477 U.S. at 331; *Hummel*, 817 F.3d at 1016. Second, the defendant can present affirmative evidence that negates an essential element of the plaintiff's claim. *Celotex,* 477 U.S. at 331; *Hummel*, 817 F.3d at 1016.

If the movant fails to carry its initial responsibility, the motion should be denied. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). On the other hand, if the movant does carry its initial responsibility, the burden shifts to the non-moving party to "inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 455 (7th Cir. 2018) (citation omitted). The non-moving party cannot rely on allegations in the pleadings but

rather must come forward with evidentiary materials that set forth "specific facts showing that there is a *genuine issue for trial*" on all essential elements of his case. *Celotex*, 477 U.S. at 324; *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009); *see also* FED. R. CIV. P. 56(c)(1). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In deciding a motion for summary judgment, the court "must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014).

## FACTUAL BACKGROUND

At all relevant times, Plaintiff was (and is still) a resident of Centralia Correctional Center (Doc. 99, p. 1). Venerio Santos was a medical doctor employed by Wexford Health Sources, Inc. as the Medical Director at Centralia (Doc. 99, p. 1). Wexford was (and still is) the State of Illinois' contracted medical provider for Centralia (Doc. 99, p. 2).

Steve Meeks was the medical director for the IDOC between November 2016 and March 2020 (Doc. 173, p. 1). Meeks did not provide any direct medical care to Plaintiff (Doc. 173, p. 1). Lana Nalewajka was the Health Care Unit Administrator (HCUA) at Centralia between May 1, 2018 and August 24, 2021 (Doc. 173, p. 2). Nalewajka did not provide any direct medical care to Plaintiff (Doc. 173 p. 2).

A. **Medical Care Provided to Plaintiff**[1]

On January 16, 2019, Plaintiff presented to nursing sick call requesting a hearing exam (Doc. 157, p. 1). He testified that throughout January 2019, he experienced excruciating ear pain (Doc. 152-3, pp. 14-15). Plaintiff requested a hearing test during this visit, but the nurse was unable to locate the audiogram and protocol to perform the exam (Doc. 152-2, p. 10).

On January 17, 2019, Plaintiff presented to the nursing sick call complaining of dizziness, vertigo, and nausea. His blood pressure was elevated. He had no signs or symptoms of an ear infection, and his ears were not reddened. The nurse placed him on the doctor's list for an evaluation of his vertigo and elevated blood pressure (Doc. 142-1, pp. 1-3). Plaintiff wrote a January 24, 2019 grievance complaining about the delay in his visit with a doctor and claiming he has a chronic ear condition which causes hearing loss and pain in his right ear, diagnosed in 2014 (Doc. 14-1, p. 12). He explained that he experiences constant ringing in his ears and when the pressure builds up, he has earaches, his ears itch, and he gets dizzy and nauseous (Doc. 14-1, p. 12).

---

[1] The Court notes that the parties submitted extensive briefing on the undisputed factual allegations in this case. Defendants Santos and Wexford filed a 38-page memorandum in support of their motion for summary judgment, 22-pages of which were just factual allegations (Doc. 142, pp. 1-22). Plaintiff filed a 55-page response just to the factual allegations (Doc. 153). The Local Rules outline that "motions/briefs and responses shall be no longer than 20 double-spaced typewritten pages in 12-point font." *See* U.S. District Court Southern District of Illinois, LOCAL RULES, available at https://www.ilsd.uscourts.gov/Forms/2021LocalRules.pdf (last visited September 6, 2022). The Local Rules outline that this page limit applies unless the presiding judge has entered an order modifying the limits in a particular case, which did not happen here. Nevertheless, the Court will consider the submissions in their entirety (rather than striking the submissions and ordering re-briefing), but both parties are reminded to comply with this Local Rule, and all Local Rules, in future matters.

Santos first examined Plaintiff's ears on January 31, 2019, and determined he had impacted cerumen (ear wax) in his right ear (Doc. 142-1, p. 4; Doc. 142-2, pp. 22-23). Santos also recorded that Plaintiff says he experiences vertigo, tinnitus, and pressure, at times (Doc. 142-1, p. 4). Plaintiff was prescribed a Debrox protocol during this visit for impacted ear wax (Doc. 142-2, pp. 23). A Debrox protocol means that Plaintiff had to put drops in his affected ear to soften the impacted wax, wait a period of time (5-7 days), and then see a nurse to flush the softened wax out from his ear (Doc. 142-2, p. 23).

On February 5, 2019, Plaintiff's right ear was flushed out as part of the Debrox protocol, and he was scheduled for a follow-up appointment with Santos (Doc. 142-1, p. 5). The next day, on February 6, Santos saw Plaintiff follow-up appointment, and Santos noted the right ear was "resolved" (Doc. 142-1, p. 6; 142-2, pp. 23-24). However, Plaintiff says this is not so and that the issues with his ear were *not* resolved.[2]  He says that at this February 6, 2019 visit, his symptoms were "horrible" and he was experiencing vertigo, "a lot of pain," and his ears felt "sticky" (Doc. 152-3, p. 18).

Plaintiff returned to nursing sick call on February 9, 2019 complaining of right ear pressure and ringing in both of his ears (Doc. 142-1, p. 7). Plaintiff's outpatient progress notes detail that he has "chronic unresolved ear pressure and tinnitus" dating back to 2014 (Doc. 142-1, p. 7). The nurse noted that Plaintiff's external ear had a "normal appearance" with no drainage, and he was given Ibuprofen (Doc. 142-1, p. 7). But the nurse also noted that Plaintiff had a slightly red throat and ringing in both of his ears

---

[2] Plaintiff wrote a letter to the Administrative Review Board, as part of an appeal for his grievance numbered E-19-1-125, in which he discusses the diagnosis of his rare ear condition and the continued pain he is experiencing (Doc. 14-1, pp. 16-17).

(Doc. 142-1, p. 7). He was also told to do blood pressure checks for one week and was put on the list to see a doctor (Doc. 142-1, p. 7).

Plaintiff saw Santos on February 11, 2019, who determined that Plaintiff once again had impacted ear wax in his ear and an Eustachian tube dysfunction due to Plaintiff's complaint of tinnitus and pressure in his ears. Santos ordered another Debrox protocol (Doc. 142-1, p. 8; 142-2, p. 24). Plaintiff returned to nursing sick call on February 17, 2019 to have the wax in his left ear flushed out. The next day, on February 18, 20219, Defendant Santos again examined Plaintiff's ear. His ear was intact with no more wax, but he still had some Eustachian tube congestion, so Santos recommended the Valsalva maneuver to alleviate pressure in Plaintiff's ears (Doc. 142-1, p. 10; 142-2, p. 24-25).

Plaintiff did not return to the healthcare unit until about a month later on March 14, 2019 for right ear pain. Defendant Santos felt the Eustachian tube dysfunction was persistent and wanted to rule out the presence of an infection, so he prescribed an antibiotic, Augmentin, for ten days (Doc. 142-1, pp. 11 ; 142-2, p. 26). On March 27, 2019 (three days after completing the 10-day Augmentin regimen), Plaintiff returned to nursing sick call reporting pain in his right ear with draining ear wax and hearing loss. The nurse prescribed pain medication and put him on the doctor's visit list (Doc. 142-1, p. 14). Plaintiff saw Santos on Mach 29, 2019 and Santos determined that Plaintiff had acute otitis externa after observing some white-ish discharge in Plaintiff's ear. Santos noted that Plaintiff's ear drum was "intact." He ordered a culture and sensitivity test to identify the infectious process and find the antibiotic that would properly address the issue. Santos also prescribed Plaintiff Cortisporin ear drops (Doc. 142-1, pp. 15; 142-2, p.

28).[3] This March 29 culture and sensitivity test returned positive for many pseudomonades aeruginosa bacteria and rare staphylococcus bacteria.

On April 1, 2019, Plaintiff presented to nursing sick call complaining of ear pressure in his right ear. The nurse referred Plaintiff to the doctor line and prescribed him pain medication and the previously-ordered ear drops (Doc. 142-1, p. 18). In the outpatient progress notes, the nurse indicated that she observed a "perforation" (Doc. 142-1, p. 18).

On April 4, 2019, Santos saw Plaintiff and diagnosed him with swelling of the tympanic membrane and white-ish ear discharged caused by the pseudomonas infection. He prescribed Levaquin and Ciprofloxacin for one month (Doc. 142-1, pp. 19-20; 142-2, p. 32). Santos testified that Plaintiff had this ear infection for approximately one week as of March 29, 2019 (Doc. 142-2, p. 33).

On April 26, 2019, Plaintiff returned to nursing sick call, complaining of an ear infection, and that the ear drops bothered him. The nurse observed possible oral thrush. She prescribed Ibuprofen and put Plaintiff on the doctor visit list (Doc. 142-1, p. 20). On April 29, 2019, Santos saw Plaintiff and diagnosed him with candidiasis (oral thrush) and chronic otitis media (inner ear infection) because Plaintiff reported recurrent otitis media in his history. Santos prescribed Nystatin mouthwash for the candidiasis (Doc. 142-1, p. 21; 142-2, p. 36-37).

---

[3] In an April 2019 letter to the ARB grieving medical issues, Plaintiff claims Santos pierced his ear drum at the March 29 visit (Doc. 14-1, p. 51). Indeed, on April 1, 2019, the nurse who saw Plaintiff at sick call observed a "perforation" in Plaintiff's ear.

Santos saw Plaintiff again on May 6, 2019 for chronic otitis media. He observed that Plaintiff's left ear was within defined limits (WDL). Plaintiff's right-sided tympanic membrane was dull, but had no swelling, reddening, or exudate, and Santos marked it was improving (Doc. 142-1, p. 23). Defendant Santos prescribed another month of Ciprofloxacin ear drops. *Id.*[4]

On June 1, 2019, Santos saw Plaintiff, who complained of ear pain and throat congestion, but his right tympanic membrane was grossly intact and he had no ear drainage. Santos concluded that Plaintiff's ear infection was continuing to improve, and he recommended Plaintiff continue the Ciprofloxacin ear drops. He also prescribed Claritin (Loratadine) (Doc. 142-1, pp. 25-26; 142-2, p. 41). On June 26, 2019, Plaintiff wrote a grievance in which he explained that Defendant Santos informed him his treatment was completed because the infection was "gone" during his June 1, 2019 visit, but that Plaintiff was still experiencing extreme pain, dizziness, and drainage from his ears, as well as wax build up (Doc. 14-1, pp. 73-74).

Also on June 26, 2019, Plaintiff presented to nursing sick call complaining of pain in both ears. The outpatient progress notes indicated that the nurse observed a small amount of wax in his ears, while he reported "constant" and "chronic" pain. He stated he did not want to see the doctor and did not want ear drops; rather he wanted Motrin, which was prescribed (Doc. 142-1, p. 28). But Plaintiff says the nurse misconstrued his words during this visit and that he did not say he didn't want to see the doctor (Doc. 152-

---

[4] Again here, Plaintiff says this is not the whole story. He contends that more happened at this visit, including that Plaintiff continued to experience ear pain and wanted Defendant Santos to run another ear culture before prescribing additional antibiotics (Doc. 153, p. 7).

3, pp. 38-39). Prior to this visit, around the beginning of June, plaintiff testified that he asked to see a specialist for his ear issues (Doc. 152-3, p. 37).

On July 5, 2019, Plaintiff returned to nursing sick call complaining of bilateral ear pain. The nurse observed yellow-white pus in both ears and put Plaintiff on the list to see the doctor (Doc. 142-1, p. 29). On July 28, 2019, Plaintiff saw Dr. Percy Myers, who noted that he has been on oral antibiotics and topical ear drops for more than thirty days. He previously had an ear culture, and the medications were given in accordance with the culture results (Doc. 142-1, p. 30). Dr. Myers noted that Plaintiff had thrush on his tongue and bilateral whiteish flakes in his ear canals (doc. 142-1, pp. 30-32). Dr. Myers determined that plaintiff's ear infections were resistant to treatment, so he ordered a new ear culture, entered a referral to collegial review proposing an ENT appointment, prescribed antifungal medications (Fluconazole/Diflucan and Nystatin), scheduled Plaintiff to return to the clinic in one week to review the culture, and prescribed Plaintiff Tylenol (Docs. 142-1, pp. 30-32; 142-2, pp. 42-44). While Dr. Myers determined that Plaintiff's issues were resistant to treatment, Santos disagreed and said he observed some improvement while Plaintiff was on antibiotics (Doc. 142-2, pp. 44-45).

On July 15, 2019, Santos attended a collegial call with Dr. Stephen Ritz to review Dr. Myers' July 8 request for an ENT referral.[5] The results of the July 8 culture and sensitivity test were not available at the July 15 meeting. So Santos and Ritz agreed to an

---

[5] The collegial review process prospectively discusses inmate medical care consults that are planned to go off-site, discusses consultations for specialty services, specialty procedures, or specialty studies (Doc. 153, p. 30). It's a process by which the two physicians may discuss alternative tests or treatments to perform on the patient before referral to the outside specialist or from which the outside specialist might benefit from before seeing the patient(Doc. 143-4, pp. 7-9).

alternative treatment plan (ATP) to wait for the culture and sensitivity results and provide updated exam findings once Plaintiff's antibiotic course because he had developed a resistance to the Ciprofloxacin (Doc. 142-1, p. 36; 142-2, p. 49).

The July 8, 2019 ear culture results showed few pseudomonades aeruginosa and many candida parapsilosis in Plaintiff's left ear. It showed moderate candida parapsilosis in Plaintiff's right ear (Doc. 142-1, p. 37). On July 23, 2019, Dr. Ritz and Santos issued a further ATP wherein they decided to admit Plaintiff to the infirmary and provide him IV Ceftazidime (Fortaz) (Doc. 153, p. 11). On July 25, 2019, Plaintiff admitted to the infirmary for five (5) days of IV Ceftazidime (Fortaz) to treat his chronic otitis media. He was discharged on July 30, 2019 with a recommendation for follow-up in one week (Doc. 153, p. 11).

On August 2, 2019, Plaintiff filed a motion for preliminary injunction that requested to have an appointment with an Ear, Nose, and Throat (ENT) doctor to determine "the full extent and severity of [his] medical condition" (Doc. 173, p. 3). Plaintiff filed grievance E-19-8-27 on or around August 6, 2019 (Doc. 173, p. 3). Defendant Nalewajka reviewed Plaintiff's medical records, spoke with the Assistant Warden of Programs, forwarded his grievance to the IDOC ADA Team for their recommendation, and forwarded the grievance to Defendant Meeks' office on approximately August 12, 2019 (Doc. 173, p. 3).

On August 6, 2019, Plaintiff returned to Santos' call line. Santos identified impacted ear wax in Plaintiff's ears and again recommended the Debrox protocol to soften and flush the wax. Prior to this visit, Nalewajka had informed Plaintiff that he

would receive another ear culture at this visit (Doc. 34-1, p. 1). Plaintiff told Santos that he was still experiencing pain, nausea, and dizziness (Doc. 34-1, pp. 1-4).

On August 12, 2019, Santos filled out an internal Wexford Memorandum, in which he indicated he filed an appeal on "8/12/19" at "7:30pm" (Doc. 142-1, p. 36). Santos testified that he filed this appeal to Dr. Ritz in order to get an ENT referral for Plaintiff while he was carrying out the ATP (Doc. 142-2, p. 67).

On August 13, 2019, Plaintiff again returned to Santos complaining of "excruciating" ear pain, dizziness, and because he felt "sick" (Doc. 34-1, p. 8). Plaintiff explained that he used an ear wax removal drops and "a lot of pus and fungus foamed out" of his ears (Doc. 34-1, p. 8). Santos examined his left ear and found his tympanic membrane was intact, with no swelling, no reddening, and some soft, white ear wax. He cleaned Plaintiff's ear canal; it had no drainage. He prescribed Motrin for the pain and told him to return if he experienced infection or drainage (Doc. 142-1, p. 53). According to Plaintiff, Defendant Santos relayed that there was nothing to culture and the infections were under control (Doc. 34-1, p. 8).

One week later, on August 19, 2019, Santos and Ritz had a collegial call and agreed to monitor Plaintiff's condition and place him on a course of VoSol (Doc. 153, p. 13). The same day, Plaintiff presented to nursing sick call complaining of pain in his ears. The nurse observed a moderate amount of white pus in his left ear and a small amount of wax in his right ear. She referred him to the doctor call line (Doc. 142-1, p. 55).

Santos saw Plaintiff the next day, on August 20, 2019. He observed wax in his ear canal and provided him VoSol ear drops, which is an acetic acid ear medication intended

to dry out the ear canal (Doc. 142-1, p. 56). Plaintiff says that he again informed Santos about his excruciating ear pain, vertigo, distorted hearing, and a feeling of liquid in his ears (Doc. 34-1, p. 9).

Plaintiff returned to Santos on August 27, 2019 and Santos continued his VoSol medication (Doc. 142-1, p. 57). Plaintiff contends that he told Santos that his ears still hurt and that he had white "crust" in his ears (Doc. 152-7, p. 22). Plaintiff further contends that Santos told him the infections were under control. *Id.*

On September 3, 2019, the Court granted a motion for preliminary injunction and ordered Defendants to schedule an appointment with an ENT specialist to take place within 14 days of the date of the Order (Doc. 38, p. 3).[6] On September 6, 2019, Santos examined Plaintiff and directed Plaintiff to discontinue to the VoSol and took a third culture of Plaintiff's left ear (Doc. 142-1, p. 58).[7] The culture and sensitivity results returned that Plaintiff's left ear had no yeast or fungal elements and now only a few candida parapsilosis (Doc. 142-1, p. 59).

On September 13, 2019, Plaintiff presented to nursing sick call complaining of both ears hurting and white drainage from both ears. The nurse observed "yeast type" drainage and referred Plaintiff to Santos (Doc. 142-1, p. 60). The same day, September 13, Santos ordered Plaintiff placed in the infirmary to monitor his vital signs, continue his

---

[6] Defendant filed a notice with the Court on September 16 (Doc. 42), outlining the efforts it had made to comply with the Court's injunction and that the earliest possible appointment secured for Plaintiff with an ENT specialist was September 30, 2019.

[7] Plaintiff contends that this statement only explains a "portion of what happened at the 09.06.19 visit" with Defendant Santos. Plaintiff then cites to a series of exhibits, but does not explain what portions of the exhibits, exactly, the Court should consider (Doc. 153, p. 14).

medications, and provide him Motrin while awaiting the results of his September 6 culture and sensitivity test (Doc. 142-1, p. 61-77). On September 16, 2019, Santos prescribed Plaintiff a prescription for the anti-fungal medication Fluconazole (Diflucan) (Doc. 142-1, p. 69).

On September 29, 2019, Plaintiff reported to a nurse that the "fungus is coming out of my ears. I feel better" (Doc. 142-1, p. 74). On September 30, 2019, Plaintiff attended an appointment with ENT Dr. Nathan Joos (Doc. 142-3, pp. 2-3) pursuant to the Court's Injunction. Dr. Joos debrided leftover inflammatory cerumen from Plaintiff's ear canals and noted his eardrums were normal and without signs of infection (Doc. 142-3, p. 2). Dr. Joos opined Plaintiff's external auditory canal looked in fairly good condition with minimal inflammation, he saw no middle ear pathology, and his bilateral otitis externa was improving (Doc. 153, p. 16). Dr. Joos performed rough hearing tests, the Weber test and the Rinne test, and Plaintiff's hearing was normal (Doc. 153, p. 16).

Dr. Joos did not provide any antibiotics because he saw nothing suggesting bacteria was driving Plaintiff's medical condition (Doc. 153, p. 16). Dr. Joos completed the "Report of Referral" form and noted Plaintiff had resolving otitis externa and reports of Eustachian tube dysfunction. Dr. Joos recommended Plaintiff continue the Diflucan, add Lotrimin drops, add Fluticasone, and call for a follow-up appointment if his symptoms persisted (Doc. 142-1, p. 79). Specifically, Dr. Joos noted that Plaintiff "could be reevaluated in a couple of weeks if the facility prefer" (Doc. 161-4, p. 3).[8]

---

[8] Defendants ultimately had to be enjoined a second time after taking the position that Dr. Joos' recommendation was to follow up in "six to eight weeks" if Plaintiff's symptoms persisted (*See* Docs. 58, 62). Dr. Joos's notes, however, very clearly say a "couple of weeks." (Doc. 58-3, p. 3, Doc. 62, p. 5).

On October 1, 2019, Plaintiff discharged from the infirmary with a recommendation to follow up in ten days (Doc. 142-1, p. 77). But on October 16, 2019, Plaintiff presented to nurse sick call, again reporting bilateral ear pain, drainage, and some hearing loss (Doc. 142-1, p. 82).

On October 17, 2019, Santos says he examined Plaintiff and noted drainage and pain in his ears. Santos observed white-yellowish flaky wax in Plaintiff's ears and used a Q-tip dipped in saline to clean it. He ordered Plaintiff to continue his medications, added a Naprosyn medication, and scheduled him for a one week follow-up (Doc. 142-1, p. 83) (Santos' notes from this interaction are illegible). Plaintiff says that more happened during this visit. When Santos cleaned Plaintiff's ears (twice) with a Q-tip, Plaintiff says he observed dark red blood on the Q-tip (Doc. 152-2. P. 65). This visit prompted Plaintiff to file a grievance dated October 20, 2019 (grievance number 19-10-79) in which he complains of continued ear pain and worries that he may develop more serious infections because of Santos treatment (Doc. 152-2, pp. 65-66).

One week later, on October 24, 2019, Santos saw Plaintiff who reported on and off pain. Santos examined Plaintiff's ears and saw nothing abnormal, including no swelling, no tenderness, no bulging of his tympanic membranes, no reddening, and no signs of infection (Doc. 142-1, p. 84). Plaintiff says that at this visit, Santos became "irate" and accused him of lying in his October 20, 2019 grievance in which he said he saw blood on the Q-tip (Doc. 55, p. 3). According to Plaintiff, Santos "screamed" at him and "started slamming the cabinet door and throwing things in his office," which was noted in Plaintiff's October 25, 2019 grievance (grievance number 19-10-103) (Doc. 152-2, pp. 67-

68). Nalewajka responded to this grievance and indicates that she sent it to Meeks' office on or around November 1, 2019, but the grievance does not indicate whether it was actually sent or received by Meeks or his office. *Id.* Meeks testified that, to the best of his recollection, Dr. Conway was responsible for responding to appeals at the time of this grievance, but this changed over time (Doc. 161-1, pp. 20-21).

Also on October 24, 2019, Plaintiff filed another motion seeking injunctive relief (Doc. 55). Plaintiff's motion for injunctive relief was prompted by his interaction with Santos on October 17 and 24. He claimed that at the October 17 visit with Santos, he requested a follow up visit with Dr. Joos to address his ongoing symptoms, Santos denied his request and told Plaintiff he just had excessive ear wax (Docs. 55, 62). On October 24, Plaintiff says he again requested a follow up with Dr. Joos because of ongoing symptoms and that Santos, as outlined above, became furious with him (*Id.*). Ultimately, the Court enjoined Defendants a second time, ordering Defendants to arrange for a follow up visit for Plaintiff with Dr. Joos, consistent with the instructions that had been given (Doc. 62).[9]

On November 4, 2019, Plaintiff returned to nursing sick call complaining of bilateral hearing loss. The nurse observed patches of white wax in his ears and referred him to the doctor's call line (Doc. 142-1, p. 85). Also on November 4, Lamenta Conway, IDOC Assistant Medical Director, in response to the forwarded grievances, told

---

[9] In granting a second request for injunctive relief, the Court expressed its concern over the allegations made by Plaintiff and its own review of the medical records (*See* Doc. 62, p. 5). At that time, the Court also observed that Plaintiff had seen Santos twice since his visit with Dr. Joos and rated his pain as a 7 or 8 out of 10 and that Santos responded the same way each time: by probing Plaintiff's ears with Q-tips and ordering more ibuprofen (Docs. 62, 58-2, pp. 5-8).

Nalewajka that Plaintiff should return to the ENT doctor since his complaints continued (Doc. 173, p. 5). Santos then completed a referral for Plaintiff to return to ENT Dr. Joos pursuant to Dr. Conway's instruction (Doc. 153, p. 19). The Court's second injunction was issued three days later, ordering Defendant arrange for a follow up visit with Dr. Joos within 21 days (Doc. 62). On November 9, 2019, Plaintiff saw a physician (not Dr. Santos) who prescribed him two weeks of Naprosyn for pain, ten days of Augmentin, ten days of Cortisporin ear drops, and recommended he follow up with Santos (Doc. 153, p. 19).

On November 15, 2019, Plaintiff presented to Nurse Practitioner (NP) Jaela Flowers, with Dr Joos' office. Dr. Joos was not available until January 2020, and the Court clarified its Order, noting that Defendants can comply with the Injunction by securing a visit with NP Flowers (Doc. 65). He reported burning in his ears radiating down his throat, with occasional hoarseness, odynophagia, heartburn, and nasal congestion (Doc. 153, p. 19). NP Flowers performed a flexible laryngoscopy and diagnosed him with laryngopharyngeal reflux (LPR) with referred otalgia (pain in the ear), and rhinitis. Plaintiff's eardrums were functioning appropriately, and he had no fluid in the middle ear space; his ear canals were clear of infection.

NP Flowers started Plaintiff on Omeprazole and a Medrol Dosepak, as well as recommending he continue his rhinitis medication (Doc. 153, p. 19). Plaintiff also received a tympanogram evaluation, which is a test of pressure on the eardrum, and received an essentially perfect result (Doc. 153, pp. 19-20). NP Flowers recommended medications and to follow up with Dr. Joos in six (6) weeks if needed (Doc. 153, p. 20).

On February 3, 2020, Plaintiff returned to Dr. Joos and reported he still had some itching and ear pain bilaterally and mild discomfort. He had no active drainage and no facial swelling, and occasional lightheadedness without vertigo. Dr. Joos cleaned Plaintiff's ears, saw no effusion or infection, and diagnosed him with psoriatic ear canals. He recommended Fluconazole eardrops every 2-3 days when necessary and to follow up in 3 or 4 months to repeat debridement/cerumen removal (Doc. 153, p. 21).

On February 6, 2020, Plaintiff saw Dr. Reynal Caldwell for a follow-up from his February 3, 2020 ENT (Doc. 153, p. 21). On February 19, 2020, he saw Dr. Percy Myers on follow-up from Dr. Caldwell, and Dr. Myers noted he needed the collegial submission to return to Dr. Joos in 3-4 months (Doc. 153, p. 21).

On March 8, 2020, Plaintiff presented to nursing sick call complaining of ear pain for one day, and he received pain medication (Doc. 153, p. 22). On March 13, 2020, he returned to nursing sick call complaining of ear pain and green-yellow drainage (but noting his ear drops were green too). Plaintiff also complained of excruciating pain in his ears and difficulty hearing (Doc. 142-1, p. 96). He had bilateral ear redness. The nurse put Plaintiff on the doctor call list and noted he was requesting a hearing screen (Doc. 142-1, p. 96).

On March 23, 2020, Dr. Santos performed a lockdown review of Plaintiff's chronic otitis media and ordered him to continue his ear drops and follow-up in two weeks (Doc. 153, p. 22). On March 25, 2020, Plaintiff again attended nursing sick call, reporting ear pain. His ears appeared within normal limits (WNL) to the nurse. He requested Naprosyn pain medication (Doc. 153, p. 22). Also on March 25, 2020, Plaintiff saw Santos who

concurred with the nurse's observations, in that Plaintiff did not have reddening, discharge, or tenderness (Doc. 142-1, p. 99).

On July 1, 2020, Plaintiff saw Dr. Joos, who noted the degree of ear discomfort Plaintiff was reporting was above and beyond a notable cerumen impaction, but after Plaintiff's ears were cleaned, the pain resolved. Plaintiff had no infection, and Dr. Joos noted his psoriatic ear canals appeared much better. He recommended occasional steroid drops, more frequent Debrox protocol, and a CT scan of the temporal bone without contrast to rule out any other middle ear pathology or associated temporal bone pathology (Doc. 153, p. 24). On July 17, 2020, Plaintiff received a CT of his internal auditory canals (IAC) which was normal and negative for any abnormalities (Doc. 153, p. 24).

As of his March 31, 2021 deposition, Plaintiff reported he felt "a lot" better and could hear "a lot" better. Occasionally his ears will hurt or his hearing muffled, but it is "nothing like it was" (Doc. 153, p. 25). As of his March 31, 2021 deposition, Plaintiff does not take pain medication, but he uses Nasacort, DermOtic oil, and Debrox ear drops (Doc. 153, p. 25). He had received the Debrox protocol Dr. Joos recommended on July 1, 2020 and was no longer experiencing side effects from the medications he took to resolve his ear infections (Doc. 153, p. 25). Plaintiff also noted that he believed his ear infections resolved in October of 2019 but he continued to experience pain into June of 2020 from the treatments for these infections (Doc. 153, p. 25). Plaintiff saw Dr. Joos again on July 1, 2020 (Doc. 173, p. 6).

### B. The Treatment of Ear Conditions Generally

Otitis externa is an inflammatory condition or infection of the ear canals outside of the eardrum which can present with a few days of ear discomfort, drainage from the ear, and some muffled hearing (Doc. 153, p. 25). A traditional treatment course for otitis externa would be treatment with medicated ear drops for up to fourteen days and have the patient contact the physician in two to three weeks (Doc. 153, p.26). If otitis externa symptoms persist for greater than three weeks, the next step would be to perform another examination, possibly clean the ears, and consider adding an oral antibiotic or culturing the ear (Doc. 153, p. 26). Otitis media occurs when the small space behind the eardrum fills with fluid (Doc. 153, p. 26). A traditional otitis media complaint presents with discomfort, muffled hearing, and fever. It is treated with pain medications (Ibuprofen, Tylenol) and oral antibiotics (Doc. 153, p. 26). If otitis media persists, the next step would be to determine if the fluid in the ear was purulent or not. If not purulent (e.g. "leftover fluid or mucus material") the course would be lots of waiting with maybe rhinitis therapy. If the fluid was purulent, the next step would be broader spectrum antibiotics (Doc. 153, p. 26).

Eustachian tube dysfunction is typically driven by inflammation through the nose and may be treated with medications for allergies and rhinitis such as Flonase and Claritin (Doc. 153, p. 26). In 8-9 out of 10 cases, the first treatment modality for an otitis externa complaint is ear drops and antibiotics and to proceed with an ear culture to determine if there is something unusual about the cause of the infection (Doc. 153, p. 27). Common antibiotics to try in the first round include Ciprofloxacin (Doc. 153, p. 27). If the

antibiotic drops do not clear the infection, the next step might be to try culturing the ear. Drainage from the ears does not always equate to an infection (Doc. 153, p. 27).

Debrox drops are hydrogen peroxide-based drop to help alleviate routine wax build-up (Doc. 153, p. 27). Pseudomonas is the most common agent for otitis externa infections (Doc. 153, p. 28). Occasionally pseudomonas bacteria can become resistant and require the use of IV antibiotics to treat (Doc. 153, p. 28). Staphylococcus bacteria is another common bacteria in ear, nose, and throat infections (Doc. 153, p. 28). Candida parapsilosis is a yeast infection and would be treated with VoSol, Lotrimin, and Fluconazole. Oral thrush is a possible side effect or expected risk factor from using any oral antibiotic. The Valsalva maneuver is a way to relieve pressure in the Eustachian tubes (Doc. 153, p. 28). Psoriatic ear canals can create more wax volume and allow for opportunistic infections, and the condition (psoriatic ear canals) can be difficult to predict because it waxes and wanes in severity (Doc. 153, p. 28). Psoriatic ear canals can be a chronic condition which waxes and wanes over a period of years (Doc. 153, p. 29).

### C. IDOC officials Involvement

In working as the HCUA and addressing Plaintiff's grievances, Nalewajka emailed various people, including Susan Walker, Mary Klein, and Dr. Conway, in her attempts to forward Plaintiff's concerns to the State Medical Director's Office (Doc. 176, p. 1).[10] Nalewajka testified that she emailed who she believed to be Dr. Meeks'

---

[10] Nalewajka is not a licensed physician and cannot diagnose a patient's condition, prescribe a particular line of treatment, or independently order referrals, or testing (Doc. 164, p. 29; 43-44; 173, p.3). She testified that during the grievance process, she can direct

administrative assistant, Thomas White, requesting Plaintiff's condition and complaints be evaluated on June 7, 2019, but that he did not respond (Doc. 176, p. 3). Thomas White was addressed or copied in several emails discussing Plaintiff's condition, grievances, and complaints from Defendant Nalewajka on June, 7, July 1, August, 9, 20, and October 3, 9, and 22 10 (Doc. 176, p. 1). There are only two e-mails from Nalewajka that actually CC'ed Dr. Meeks. The first occurred on August 19, 2019, notifying the recipients that she has a call with the Attorney General's office regarding Plaintiff's case and that he was sent to collegial again that day requesting an ENT follow-up, but an ATP was developed instead (Doc. 173-1, p. 15). The second occurred on August 20, 2019, as a follow up to the previous email promising the most recent documentation (Doc. 173, p. 15).

Grievance E-19-1-125 was appealed to State Medical Director on February 6, 2019; Grievance 19-4-117 was appealed to State Medical Director on May 28, 2019; Grievance 19-4-122 was appealed to State Medical Director on May 28, 2019; Grievance E-19-4-125 was appealed to State Medical Director on May 28, 2019; and Grievance 19-7-18 was appealed to State Medical Director on May 28, 2019 (Doc. 176, p. 1). Grievance E-19-6-103 was forwarded by defendant Nalewajka to the Medical Director's Office on or around July 2, 2019 (Doc. 176, p. 3). However, Meeks testified that during this time frame, to the best of his recollection, Dr. Conway was responsible for responding to appeals (Doc. 161-

---

a doctor to re-evaluate a patient or re-evaluate the medicine prescribed to a patient (Doc. 164, pp. 43-44).

1, pp. 20-21). Indeed, it was Dr. Conway (not Meeks) who reviewed certain grievances and indicated to Nalewajka that Plaintiff should return to the ENT (Doc. 173, p. 5).

## DISCUSSION

The Eighth Amendment's proscription against cruel and unusual punishment creates an obligation for prison officials to provide inmates with adequate medical care. *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, (1994)). Evaluating whether the Eighth Amendment has been violated involves a two-prong analysis. The court first looks at whether the plaintiff suffered from an objectively serious medical condition and, second, whether the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *E.g., Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). In applying this test, the court "look[s] at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728–29 (7th Cir. 2016).

In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate he suffered from an objectively serious medical condition. *Id.* at 591-92. Second, the plaintiff must establish the individual prison officials were deliberately indifferent to that condition. *Id.*

"An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would

perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Importantly, "[a] medical condition need not be life-threatening to be serious." *Id.* It can be a condition that "significantly affects an individual's daily activities" or a condition that would result in further significant injury or chronic and substantial pain if left untreated. *Hayes v. Snyder*, 546 F.3d 516, 522–23 (7th Cir. 2008).

### A. Dr. Santos

Santos argues that he provided consistent care to Plaintiff, and that he was not deliberately indifferent to Plaintiff in his medical treatment of him. Plaintiff disagrees, and argues that Santos did not take his ear infections, pressure, and pain seriously, and through his care and treatment, delayed Plaintiff's referral to a specialist (Doc. 154, pp. 4-6). Ultimately, Plaintiff argues it took 8-9 months for him to see a specialist for his ear pain and pressure, and only after Court intervention on two occasions.

Santos concedes that Plaintiff has a complicated infectious disease process in his ears. In other words, Plaintiff has an objectively serious medical condition. Accordingly, the Court's analysis focuses on the second prong and whether Defendant Santos has the requisite subjective intent. A prison official exhibits deliberate indifference when they know of a serious risk to the prisoner's health but they consciously disregard that risk. *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citation omitted). "The standard is a subjective one: The defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference." *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (quoting *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016)). The deliberate indifference standard "requires more than

negligence and it approaches intentional wrongdoing." *Holloway*, 700 F.3d at 1073. It is "essentially a criminal recklessness standard, that is, ignoring a known risk." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (citation omitted).

In the context of medical professionals, the deliberate indifference standard has been described as the "professional judgment standard." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008). Treatment decisions are "presumptively valid" and entitled to deference so long as they are based on professional judgment—meaning they are fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm, and the efficacy of available treatments—and do not go against accepted professional standards. *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (citation omitted); *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017); *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011). A medical professional may be held to have displayed deliberate indifference if the treatment decision was "blatantly inappropriate" even to a layperson, *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Petties*, 836 F.3d at 729 (a jury can infer deliberate indifference when "a risk from a particular course of medical treatment (or lack thereof) is obvious."), or there is evidence that the treatment decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Petties*, 836 F.3d at 729.

Generally speaking, Plaintiff's claim against Santos focuses on two general theories. The first is that Santos ignored Plaintiff's pain and complaints, and persisted in an ineffective treatment regimen instead. The second is that there was an inexplicable

delay of 8-9 months in Plaintiff's referral to an ENT, and this is indicative of deliberate indifference.

The Court must first note that there are a numerous factual disputes surrounding the care and treatment Plaintiff received by Dr. Santos. For example, on February 6, 2019 when Plaintiff returned to Santos after having his ear flushed as part of the Debrox protocol, Santos noted in Plaintiff's medical records that the right ear was "resolved" (Doc. 142-1, p. 6; 142-2, pp. 23-24). However, Plaintiff says this is not accurate and that he reported ear pain, pressure, hearing loss and vertigo, he had tinnitus and that his ears felt sticky (Doc. 152-3; Doc. 153, p. 34). Plaintiff says the Debrox did not help with his pain and that Santos simply told him they were finished.

Another example is Plaintiff's March 29 visit with Santos. At this visit, Santos noted that Plaintiff's ear drum was intact, ordered a culture and sensitivity test, and prescribed Plaintiff Cortisporin ear drops. However, Plaintiff says that when Santos swabbed his ear, he felt severe pain and pressure as a result of Santos piercing his ear drum. Indeed, when Plaintiff visited a nurse on April 1, 2019, the nurse noted a perforation in Plaintiff's ear (Doc. 142-1, p. 18). And another example is at Plaintiff's October 17, 2019 visit, Santos says he observed white-yellowish flaky wax in Plaintiff's ears and used a Q-tip dipped in saline to clean it. However, Plaintiff says that when Santos cleaned his ears, he observed dark red blood on the Q-tip. Santos, of course, makes no mention of this. These examples of factual disputes concern the care and treatment provided to Plaintiff by Santos, which is one of the key issues in this case. Accordingly, these disputes must be resolved by a jury and are itself a basis to deny summary

judgment.

But in addressing the arguments advanced in the briefs, the Court cannot say that no reasonable juror could find in favor of Plaintiff on his claim against Santos. While Santos ultimately characterizes Plaintiff's position as a mere disagreement with the course of treatment, it is equally plausible that a reasonable jury could look at the record and conclude that Santos persisted in a course of treatment over a period of many months that was obviously ineffective. Indeed, when Plaintiff saw Dr. Meyers (in other words, not Santos), on July 28, 2019, it was Dr. Meyers who determined that Plaintiff's ear infections were resistant to treatment. It was Dr. Meyers, who at that time, ordered a new ear culture, entered a referral to collegial review proposing an ENT appointment, prescribed antifungal medications (Fluconazole/Diflucan and Nystatin), and scheduled Plaintiff to return to the clinic in one week to review the culture, and prescribed Plaintiff Tylenol (Docs. 142-1, pp. 30-32; 142-2, pp. 42-44).[11] Based on the record, as a whole, the Court cannot say that no reasonable juror could find in favor of the Plaintiff.

The second issue is the lengthy delay in the referral to an ENT. A plaintiff must provide evidence, either direct or circumstantial, to prove deliberate indifference. *Petties*, 836 F.3d at 728. Direct evidence is rarely forthcoming, so "[m]ost cases turn on circumstantial evidence." *Id.* To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must provide "independent evidence that the delay exacerbate the injury or unnecessarily prolonged pain." *Id.* at 730-

---

[11] Indeed, it was Dr. Santos who prescribed a repeat of the Debrox protocol in February 2019 and then again later on in the treatment, as well as repeats of ear drops, thus persisting in this course of treatment rather than considering alternatives.

31 (citing *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007)) (delay actionable where medical records showed it unnecessarily prolonged plaintiff's pain and high blood pressure); *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (hours of needless suffering can constitute harm).

Based on the record as a whole, a reasonable juror could conclude that the lengthy delay unnecessarily prolonged Plaintiff's pain and/or exacerbated his injury. In fact, the Court had to enjoin Defendant not once, but twice as a result of Santos' treatment of Plaintiff. And during the many months that Plaintiff was treating with Santos, he was constantly and consistently reporting ear pain and significant discomfort. It is certainly plausible, based on the record as a whole and viewing all inferences in light of the Plaintiff, that a reasonable jury could find for the Plaintiff. Accordingly, summary judgment with respect to Santos must be denied.

### B.  Lana Nalewajka and Steve Meeks

In Eighth Amendment claims arising from a prisoner's medical care, a non-medical prison official is entitled to summary judgment when he reasonably responds to an inmate's complaint or grievance by ensuring the inmate has been evaluated by a physician and received medical care for the complained of condition. *Johnson v. Doughty*. 433 F.3d 1001, 1010-12 (7th Cir. 2006). Plaintiff says that Nalewajka and Meeks were deliberately indifferent to his serious medical needs because they interfered and/or delayed his treatment, which prolonged his pain and discomfort.

First, as for Nalewajka, the evidence shows that she attempted to address Plaintiff's medical concerns and issues in her responses to his grievances and by

contacting the State Medical Director's Office. In fact, Plaintiff concedes that Nalewajka e-mailed various people, including Dr. Conway in her attempts to relay Plaintiff's concerns to the State Medical Director's Office (Doc. 173, ¶ 25). Nalewajka personally contacted the Medical Director's Office on June 7, 2019, requesting that Plaintiff's condition and complaints be evaluated and she was told that her request would be submitted for review (Doc. 173, ¶ 26). And Nalewajka sent a multitude of e-mails to the State Medical Director's Office discussing Plaintiff's condition, grievances, and complaints, which included Thomas White, the Medical Director's administrative assistant. Indeed, Nalewajka e-mailed Dr. Meeks, directly, on August 19, 2019 discussing Plaintiff's appeals and its elevation to the Attorney General's office and followed up the next day. Nalewajka is not a licensed physician and she is not able to diagnose anybody, prescribe medications, order referrals or testing, or make a determination as to whether treatment is medically necessary (Doc. 173, p. 2-3).

When viewing the record as a whole, and drawing all reasonable inferences in favor of the Plaintiff, the evidence suggests that Nalewajka did all she could do for Plaintiff under the circumstances. No reasonable juror could conclude that Nalewajka was deliberately indifferent to Plaintiff in the limited role that she plays here. *See Johnson*, 433 F.3d at 1010, referencing *Greeno*, 414 F.3d at 656 ("Perhaps it would be a different matter if [the non-medical prison official] had ignored [the plaintiff's] complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address [the plaintiff's] concerns.").

As for Defendant Meeks, he argues he was never personally aware of Plaintiff's complaints and, therefore, could not have the requisite mindset for Plaintiff to sustain an Eighth Amendment claim against him. Plaintiff contends that Defendant Meeks was made aware of the issues with Plaintiff's care when he appealed grievances and through emails with Defendant Nalejwaka. There are certainly e-mails in the record showing that Nalewajka e-mailed Meeks's Office (*See* Doc. 173-1). But Nalewajka's August 9, 2019, e-mail to Meeks's assistant, Thomas White, recognizes that Meeks or *someone within Meeks's office*, may be looking into this (Doc. 173-1,p. 3). In other words, this does not provide the certainty that Plaintiff needs to establish Meeks's mindset. Moreover, Meeks testified that during the time frame at issue, he was not personally responding to prisoner appeals; rather, a deputy medical director responded to the appeals (Doc. 161-1, pp. 32-35). Furthermore, grievances and appeals were different, and "it would have been highly unusual for [Defendant Meeks] to have received a grievance just as part of the normal course of the way things ran" (Doc. 161-1, p. 34). And in fact  it was Dr. Conway (not Meeks) who reviewed certain grievances and communicated to Nalewajka that Plaintiff should return to an ENT (Doc. 173, p. 5).

Plaintiff argues that because Defendant Meeks, prior to August 2019, ruled on appeals, he created a "triable issue" that must go to the jury (Doc. 172, pp. 6-8). But there is nothing in the record to indicate that Meeks, himself, had knowledge of Plaintiff's issues and possessed the requisite *mindset* to sustain a deliberate indifference claim. Indeed, the only two e-mails in the record that directly CC'ed Meeks are August 19 and

20, 2019 and the content of these two e-mails is not sufficient to establish liability.[12] As such, Defendant Meeks is also entitled to summary judgment.

### C. Wexford Health Sources, Inc.

A private corporation acting under the color of state law, like Wexford, can be held liable under § 1983 for constitutional violations based on the *Monell* theory of municipal liability. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (*en banc*). The corporation cannot be held liable simply because it employed the alleged wrongdoer, *Est. of Perry v. Wenzel*, 872 F.3d 439, 460 (7th Cir. 2017); rather, "a plaintiff must show that his constitutional injury was caused by the corporation's own actions. *Pyles v. Fahim*, 771 F.3d 403, 409–10 (7th Cir. 2014) (quoting *Minix v. Canarecci,* 597 F.3d 824, 832 (7th Cir. 2010)). This requires a plaintiff to demonstrate that "the 'moving force' behind his constitutional injury" was an express policy adopted and promulgated by the corporation, an informal but widespread and well-settled practice or custom, or a decision by an official of the corporation with final policymaking authority. *Dixon v. Cnty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citing *City of Canton v. Harris,* 489 U.S. 378, 379 (1989)); *Glisson*, 849 F.3d at 379.

The *Monell* claim advanced by Plaintiff seems to be, at best, an afterthought. The allegations against Wexford in the Amended Complaint are extremely broad and really are just a couple of generalities (*See* Doc. 99, ¶ 37-39). Nor does Plaintiff squarely address

---

[12] The Court also notes that Meeks never met or evaluated Plaintiff. He was not on site at Centralia Correctional Center to personally observe Plaintiff and his symptoms, so what, exactly Plaintiff thinks Meeks should have done is unclear. And to the extent Plaintiff seeks to hold Meeks accountable because he testified that the "buck stops with him", there is no *respondeat superior* in § 1983 actions. *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 692 (1978).

Wexford's arguments for summary judgment on the *Monell* claim in the response in opposition.[13] As best the Court can tell, Plaintiff is attempting to advance a claim against Wexford that is rooted in the collegial review process, which Plaintiff says is purposefully designed to facilitate inadequate treatment of prisoners. Plaintiff argues that since the collegial review process always has the option to reject an outside referral and instead propose an alternative treatment plan it allows for, and possibly encourages, doctors to continue ineffective treatment (Doc. 154, p. 6).

As a general matter, the Seventh Circuit has made clear that "[t]he collegial review process is not unconstitutional on its face." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 651 (7th Cir. 2021). Thus, in order to maintain a *Monell* claim predicated on a "facially lawful policy" like collegial review, a plaintiff must show that the process was unconstitutional, as applied to him, which requires the plaintiff to prove "a prior pattern of similar constitutional violations resulting from the policy." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021).

Here, Plaintiff has failed to offer any evidence or make any argument of a prior pattern of similar constitutional violations and thus Plaintiff cannot establish both the requisite fault on the part of Wexford corporate and the causal connection between the policy and the constitutional deprivation. *See City of Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985) (plurality); *Dean*, 18 F. 4th at 236-37.[14] Indeed, the Seventh Circuit has "repeatedly

---

[13] In examining the cases cited by Plaintiff in the argument section of his response in opposition, the Court did not come across a single case that analyzed, illustrated, or discussed *Monell* liability. In short, Plaintiff did not offer the Court any authority to support his position and stave off summary judgment on this claim.
[14] There are limited exceptions to this rule and in some rare cases, a plaintiff could still present a viable *Monell* claim if he showed his situation was the type that prison medical providers were almost certain to

rejected *Monell* claims that rest on the plaintiff's individualized experience without evidence of other constitutional violations." *Dean*, 18 F.4th at 240. The only substantive proof Plaintiff has offered here relates to the delays in care that he himself experienced and thus he cannot maintain a pattern and practice claim or a claim predicated on a patently obvious risk of such violations. *Id.* ("While we are sympathetic to [plaintiff's] experience, his only substantive proof relates to the delays in care that he himself experienced. He has not proven a pattern of similar constitutional violations or a patently obvious risk of such violations.").

Accordingly, Wexford is entitled to summary judgment on Plaintiff's *Monell* claim.

<u>CONCLUSION</u>

For the above stated reasons, the motion to seal (Doc. 139) is **DENIED**. The Clerk of Court is **DIRECTED to UNSEAL** Doc. 143, which are the exhibits Wexford sought leave to file under seal. The motion to strike (Doc. 155) is likewise **DENIED**.

The motion for summary judgment filed by Defendants Venerio Santos and Wexford Health Sources, Inc. is **DENIED IN PART and GRANTED IN PART**. It is **DENIED** with respect to Santos and it is **GRANTED** with respect to Wexford. The claim against Wexford is **DISMISSED with prejudice**.

---

encounter and involved "a risk of constitutional violations . . . so high and [a] need for training so obvious" that the failure to act could "reflect deliberate indifference and allow an inference of institutional culpability." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 380-82 (7th Cir. 2020), *cert. denied* 141 S. Ct. 1125 (2021). But Plaintiff made no argument and provided no evidence that his situation fell into this "narrow range of circumstances." *Id.* at 380.

The motion for summary judgment filed by Steve Meeks and Lana Nalewajka (Doc. 160) is **GRANTED**. The claims against Meeks and Nalewajka are **DISMISSED with prejudice**.

The Clerk of Court will enter judgment accordingly at the close of this case.

This case will proceed to trial on Plaintiff's claim against Defendant Santos. The Court will set this case for a status conference by separate notice to discuss the referral of this case for a settlement conference and trial scheduling.

**IT IS SO ORDERED.**

**DATED: September 20, 2022**

/s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**